No. 26-1740

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

NEW HAMPSHIRE YOUTH MOVEMENT, *Plaintiff-Appellee*

v.

DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State, *Defendant-Appellant*

COALITION FOR OPEN DEMOCRACY; LEAGUE OF WOMEN VOTERS OF NEW HAMPSHIRE; THE FORWARD FOUNDATION; MCKENZIE NYKAMP TAYLOR; DECEMBER RUST; MILES BORNE; A.M., by his next friend Russell Muirhead; and L.M., by her next friend Russell Muirhead, *Plaintiff-Appellees*

v.

DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State; and JOHN M. FORMELLA, in his official capacity as New Hampshire Attorney General, *Defendant-Appellants*

Appeal from the United States District Court for the District of New Hampshire

# APPELLANTS' MOTION FOR STAY PENDING APPEAL

JOHN M. FORMELLA
*Attorney General*
ANTHONY J. GALDIERI
*Solicitor General*

MATTHEW T. BROADHEAD
*Associate Attorney General*
MICHAEL P. DEGRANDIS
*Assistant Attorney General*

New Hampshire Department of Justice
1 Granite Place South, Concord, NH 03301
(603) 271-3650

## INTRODUCTION

This case lies at the intersection of New Hampshire voters' sovereign authority to administer elections under Article I, Section 4 of the United States Constitution, and the protections afforded New Hampshire's voters by the First and Fourteenth Amendments. House Bill 1569 ("HB 1569") requires all registering voters to provide documentary proof of their citizenship ("DPOC") to vote. RSA 654:12, I(a). New Hampshire law permits voter registration on election day. To facilitate voter registration, including for same-day registrants, New Hampshire's current law provides election officials with on-the-spot access to in-state, out-of-state, and federal databases to aid those who may not have proof of citizenship in-hand at the polls. *See, e.g.*, RSA 654:12, II-a(a) & VI (eff. July 2026).

Prior to HB 1569, State law required registering voters to prove citizenship, but if the registrant did not possess documentary proof, the registrant could self-certify citizenship by executing a Qualified Voter Affidavit ("QVA"). RSA 654:12 (repealed). Also, a voter could cast a ballot despite having been judged ineligible by a local election official, by executing a Challenged Voter Affidavit ("CVA"). RSA 659:13 (repealed). HB 1569 repealed this CVA process, and instead established a statutory right to immediate judicial review of a local election official's finding that a challenged voter is "more likely than not" ineligible to

vote. RSA 659:27-a, II(b). The Plaintiff-Appellees challenge HB 1569's repeal of both these affidavits. ECF 176 at 3-4.

The district court agreed with the Plaintiff-Appellees, declaring that the General Court's QVA- and CVA-repeals are unconstitutional in all their applications. *Id.* at 60 n.20. The court issued a statewide injunction that does not merely prohibit enforcement of discrete provisions of State election law—it is a mandatory injunction that requires the State to restore and rewrite state-issued forms and procedures. *Id.* at 96; Trial Ex. SS at 315. The character and magnitude of New Hampshire's right and duty to protect election integrity and the court's mandate upon the State, warrant a stay pending appellate review. *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) ("A State indisputably has a compelling interest in preserving the integrity of its election process."); *Lu v. Hulme*, No. 12-11117-MLW, 2013 U.S. Dist. LEXIS 46888, at *26 (D. Mass. Mar. 30, 2013) ("[A] mandatory injunction 'should be granted only in those circumstances where the exigencies of the situation demand such relief.'") (quoting *Mass. Coal. of Citizens with Disab. v. Civil Def. Agency*, 649 F.2d 71, 76, n.7 (1st Cir. 1981)). This appeal will likely succeed because the district court misapplied controlling U.S. Supreme Court precedent in at least five ways.

First, none of the Plaintiff-Appellees have proven that they have standing. The Court's Order is based on hypothetical and speculative factual assertions that

cannot establish a case or controversy. The organizations have not established that they have direct standing under the *Havens Realty* exception, or associational standing by identifying at least one member who has been or will be incapable of registering to vote without a QVA or CVA. The individuals also lack standing because each possesses proof of citizenship, and almost all of them have already successfully registered to vote in New Hampshire. Indeed, none of the individuals will ever need a QVA because State databases provide citizenship verification for each of them.

Second, even assuming, arguendo, that some plaintiff in this case has standing, that plaintiff cannot possibly sustain a facial constitutional challenge on the facts contained in this record. A facial challenge to a duly enacted state voting law cannot rest on speculation that hypothetical people, at some uncertain place and time, may experience a burden that cannot be measured or tested through the adversarial process. That showing falls far short of the constitutional standard established by the Supreme Court.

Third, the district court misapplied the *Anderson-Burdick* framework by failing to engage in the two-track approach laid out by the Supreme Court. Moreover, the district court impermissibly weighed hypothetical individualized burdens instead of the burdens experienced by the whole electorate.

Fourth, the district court did not afford the weight applied by Supreme Court decisions to the State's interest in counting only the votes of eligible voters.

Fifth, the mandatory injunction exceeds the district court's equitable authority. It requires New Hampshire to reimplement repealed State law even though such a mandatory injunction does not afford Plaintiff-Appellees any relief.

Accordingly, for the reasons stated above and explained in further detail below, Defendant-Appellants respectfully request that this Court stay execution of the district court's order pending appeal.

## BACKGROUND & PROCEDURAL POSTURE

Between February 9 and 20, 2026, the district court held a nine-day bench trial in this consolidated action. At trial, both *N.H. Youth Movement v. Scanlan*, and *Coalition for Open Democracy, et al. v. Scanlan, et al.*,[1] challenged the facial constitutionality of HB 1569's QVA-repeal. *Youth Movement*, First Am. Compl., ECF No. 50, ¶¶ 76-81 (Mar. 18, 2025) ("*YM* Compl."); *Open Democracy*, First Am. Compl., ECF No. 85, ¶¶ 92-99 (Oct. 6, 2025) ("*OD* Compl."). Plaintiff-Appellees asserted that QVA-repeal violated the First and Fourteenth Amendments to the United States Constitution by imposing an undue burden on the right to vote. *See YM* Compl. ¶¶ 76-81; *OD* Compl. ¶¶ 92-99. The QVA was a state-issued self-verification form. Trial Ex. SS at 315. It permitted a registering voter to swear

[1] "Individual Plaintiffs" are Miles Borne, A.M., and L.M. "Organizational Plaintiffs" are Coalition for Open Democracy, League of Women Voters of N.H., The Forward Foundation, and N.H. Youth Movement).

and affirm that the applicant was not in possession of the documents necessary to prove citizenship or other voter qualifications. *Id.* Plaintiff-Appellees facially challenged QVA-repeal only as it relates to proof of citizenship. *See* ECF 176 at 3 n.3.

Plaintiff-Appellee Open Democracy also challenged the constitutionality of HB 1569's CVA-repeal, asserting that repeal was unconstitutional because it imposed an unjustifiable burden on the right to vote and it denied voters procedural due process. *OD* Compl. ¶¶ 100-116. The CVA was a state-issued self-verification form. Ex. SS at 316. It permitted an individual to swear or affirm that the affiant was a duly qualified and legally domiciled voter in that specific town or ward where the voter had been deemed more likely than not ineligible to vote in that jurisdiction. *See id.*; RSA 659:27, II; RSA 659:27-a, II(b). Open Democracy did not challenge CVA-repeal as it applied to self-verification of identity. *See* ECF 176 at 3 n.3.

The court issued its Order on May 28, 2026. The Order declared that repeal of the QVA to self-verify citizenship (RSA 654:12 and RSA 654:7) is facially unconstitutional. *See id.* at 97. The court permanently enjoined Defendant-Appellants from enforcing QVA-repeal and it required the State to provide state-issued QVA forms and procedures as an option for voting registrants to establish citizenship. *See id.* The Order also declared that repeal of the CVA to self-verify

voter eligibility in response to successful voter challenges (RSA 659:27, RSA 659:27-a, RSA 659:30, RSA 659:31, and RSA 659:32) is facially unconstitutional. *Id.* The court permanently enjoined Defendant-Appellants from enforcing CVA-repeal, and it required the State to provide state-issued CVA forms and procedures as an option for voters who are more likely than not ineligible to cast ballots. *See id.*

Defendant-Appellants noticed their appeal to this Court on June 19, 2026 and simultaneously moved the district court for a stay pending appeal. On July 22, 2026, the district court denied Defendant-Appellants' Motion for Stay.

## STANDARD OF REVIEW

An appellant may move the circuit court for a stay pending appeal of a district court order or final judgment, after the district court has denied the appellant's motion. *See* Fed. R. App. P. 8(a). The Supreme Court has outlined four factors to determine whether an order should be stayed pending appeal. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

> To obtain the stay, the Defendants bear the burden of satisfying a most familiar test. They must: (1) make a "strong showing that [they are] likely to succeed on the merits" in their appeal; (2) show that they "will be irreparably injured absent a stay"; (3) show that "issuance of the stay will [not] substantially injure the other parties interested in the proceeding"; and (4) show that the stay would serve "the public interest."

*New York v. Trump*, 133 F.4th 51, 65 (1st Cir. 2025) (quoting *Nken*, 556 U.S. at 434) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987))). The most critical factors are the likelihood of success and irreparable injury to the movant, absent a stay. *Id.* at 66.

## ARGUMENT

This appeal presents complex constitutional questions that will affect each state's legal authority to establish the qualifications, parameters, and procedures of voting. The interplay between New Hampshire's Article I, Section 4 constitutional prerogative to administer its elections and the First and Fourteenth Amendments, warrants a stay until the appellate process has been completed. Defendant-Appellants will prevail on appeal because the district court's judgment rests on legal errors that stand in stark contrast to established Supreme Court precedent. The State will also be irreparably harmed if it must revive portions of a statutory scheme that its voters' elected representatives chose to reform. Furthermore, a stay will not harm Plaintiff-Appellees or any other party because the trial produced no admissible evidence of an identifiable person who would be unable to vote under New Hampshire's current election scheme. Lastly, the public interest warrants a stay pending appeal. The public expresses its interests in the policies its elected representatives enact into law, and New Hampshire law does not currently permit self-verification of voter qualifications.

## I. This Appeal Will Likely Succeed Because the District Court Substantially Departed from Settled Supreme Court Precedent and the Mandatory Injunction Exceeds the Court's Remedial Authority

Defendant-Appellants will likely succeed for at least five independent reasons. First, long-settled Supreme Court standing jurisprudence conclusively establishes that not one of the Plaintiff-Appellees has standing. Second, the court below misapplied the Supreme Court's standard for resolving facial constitutional challenges. Third, the court departed from the *Anderson-Burdick* framework by failing to apply the Supreme Court's two-track approach and by weighing voters' individualized burdens instead of the burdens of the whole electorate. Fourth, the court discounted the magnitude of New Hampshire's interest in election integrity. Fifth, the Court exceeded its constitutional authority in the scope of equitable relief it awarded.

### A. The District Court's Finding that Plaintiff-Appellees Have Standing Conflicts with Settled Supreme Court Precedent

Defendants are likely to succeed on appeal because the Plaintiff-Appellees do not have standing. "[A] plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Plaintiffs "must demonstrate standing for each claim that they press and for each

form of relief that they seek." *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 372 (1st Cir. 2023). They have not done so here.

### 1. The Organizational Plaintiffs Do Not Have Direct or Associational Standing to Challenge Affidavit Repeals

Organizations asserting direct standing must "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024). Principally relying upon *Havens Realty* and out-of-circuit decisions interpreting *Havens*, the district court found that all Plaintiff-Appellee organizations had standing to challenge HB 1569's QVA-repeal and that Open Democracy had standing to challenge CVA-repeal. *See* ECF 176 at 50-55. This appeal is likely to succeed because the court's expansive reading of *Havens* does not heed the Supreme Court's unanimous admonition that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." *Hippocratic Med.*, 602 U.S. at 393-94.

In *Hippocratic Medicine*, the Supreme Court considered whether pro-life medical associations and doctors had standing to challenge the FDA's relaxed regulatory requirements for an abortion drug. *Id.* at 373. The associations alleged that the FDA "'forced' the associations to 'expend considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id.* at 394. The plaintiffs asserted that this would

result in considerable resource reallocation "to the detriment of other spending priorities." *Id.* The associations did not have standing because "[a] plaintiff must show 'far more than simply a setback to the organization's abstract social interests.'" *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U. S. 363, 379, n.19 (1982)). Organizational standing may only be achieved where a challenged law ***directly*** affects and interferes with core ***business*** activities. *Id.* at 395.

Here, the organizations' evidence is materially indistinguishable from *Hippocratic Medicine*. The court found that the organizations "spent money and devoted staff time to updating and creating new materials" that diverted funds from other activities, after HB 1569's passage. *See* ECF 176 at 50-51 (describing Open Democracy's alleged resource diversion), 53 (describing Youth Movement's "mission-critical" activities), 54-55 (describing impact on League of Women Voters and Forward Foundation). The court did not address, however, uncontroverted evidence that each organization continues to engage in the core business activities that pre-existed HB 1569. Instead, the court equated "perceptible impairment" to the organizations' core business activities with purportedly greater difficulty in assisting registering voters. *See, e.g.*, ECF 176 at 50-52. That is a fundamental mistake of law. "[C]onflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing. Frustration of an organization's objectives is the type of abstract concern

that does not impart standing." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (quotations and citations omitted).

The *Havens* plaintiff had standing because the landlord's actions were like a manufacturer who sells defective goods to a retailer. *Hippocratic Med.*, 602 U.S. at 395. The plaintiff could not continue business activities under the conditions created by that defendant. *Id.* But here, the organizations' post-HB 1569 activities are merely responses to changes in the law—they are not consequences of it. Before QVA-repeal, each organization facilitated voter registration with events and education, and each continued to do so after enactment. *See, e.g.*, Trial Tr., ECF 150 at 53-57 (Movement), 143 at 26-31 (Coalition), 152 at 16-21 (League), 156 at 46-52 (Foundation). Even were it true that HB 1569 made it more difficult to achieve their organizational missions, frustration and policy disagreements do not confer standing. *See Havens Realty*, 455 U.S. at 379; *Hippocratic Med.*, 602 U.S. at 395-96.

The district court did not decide the issue, but if this Court examines Youth Movement's claim to associational standing, it will find that Youth Movement has not satisfied its burden. Youth Movement has not demonstrated that: (a) at least one of its members would otherwise have standing to sue in his or her own right; (b) its claim is germane to its purpose; and (c) neither its claim nor the relief it seeks requires its members to participate individually. *See Equal Means Equal v.*

*Ferriero*, 3 F.4th 24, 27-28 (1st Cir. 2021) (citing *Hunt* v. *Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)) (citations omitted); *Housatonic River Initiative v. EPA*, 175 F.4th 248, 265 (1st Cir. 2023). Defendant-Appellants are likely to succeed on each of these elements, but the first—an association member with standing—is particularly striking. Each of Youth Movement's named members is registered to vote. *See, e.g.*, ECF 154 at 11:6-11, 19:2-20:8 (Montagano), 29:4-9; 37:23-38:21 (Sumner). For the reasons explained below regarding Mr. Borne's lack of standing, the named Youth Movement members will never use a QVA because they cannot be required to prove citizenship if they re-register to vote. *See* RSA 654:12, I(a).

### 2. The Individual Plaintiffs Do Not Have Standing to Challenge QVA-Repeal or Their Claim Is Moot

The district court held that the Individual Plaintiffs have standing because HB 1569 either threatens a certainly impending injury or, in the case of Mr. Borne, injured him when he registered to vote. ECF 176 at 55. This appeal is likely to succeed because the court erred as a matter of law in at least two respects.

First, QVA-repeal did not change registering voters' obligations to prove citizenship. It foreclosed the QVA option, but it created previously unavailable options, such as verification through in-state, out-of-state, and federal databases, and vouchers for indigent registrants to acquire documentation. *See, e.g.*, RSA 654:12, II-a (eff. July 2026). That the Individual Plaintiffs may prefer QVAs to

other citizenship-verification options is a generalized grievance—it is not a concrete or particularized harm sufficient to confer standing. *See Lyman v. Baker*, 954 F.3d 351, 360-61 (1st Cir. 2020) ("Injuries that are too 'widely shared' or are 'comparable to the common concern for obedience to law' may fall into the category of generalized grievances about the conduct of government.") (quoting *Becker v. FEC*, 230 F.3d 381, 390 (1st Cir. 2000)). A.M., L.M., and Mr. Borne offered no evidence that they are injured by presenting documents readily available to them, or that the statutory alternatives to QVAs are more burdensome to them than the repealed QVAs. *See Hippocratic Med.*, 602 U.S. at 381 ("The injury also must be particularized; the injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance.") (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992)).

Second, QVAs are useless to the Individual Plaintiffs, so they have not demonstrated injury-in-fact or need for their requested relief. *See Webb*, 72 F.4th at 372. A.M., L.M., and Mr. Borne each possess state-issued Real IDs, so the State Motor Vehicles database verifies their citizenship without QVAs. *See* Joint Stip., ECF 132 ¶¶ 7-8, 23-26; RSA 654:12, VI. Mr. Borne is, in fact, New Hampshire-born, so the State Vital Records database provides redundant proof of his citizenship. ECF 132 ¶ 2; RSA 654:12, VI. But even if presenting DPOC were relevant to the Individual Plaintiffs' injuries-in-fact, each maintains a birth

certificate and passport at home. *Id.* ¶¶ 4, 28. So, their citizenship can be confirmed through State databases or through citizenship documentation—they have many options. RSA 654:12, I-II-a. Because of this, none of them could swear and affirm that he or she is "not in possession of some or all of the documents necessary to prove … citizenship[,]" as the QVA attests, without lying on the government form. Trial Ex. SS at 315. The district court's reinstatement of QVAs, therefore, cannot remedy their purported injuries.

Additionally, Mr. Borne registered to vote while this case was pending. So, were he to re-register, his prior registration will be proof of his citizenship. RSA 654:12, I(a). Mr. Borne's registration moots his claim, even if he had standing upon the Complaint's filing, because he has not maintained a personal stake in the outcome of this case. *See Steir v. Girl Scouts of the USA*, 383 F.3d 7, 15 (1st Cir. 2004). He will never present documents or execute a QVA ever again—that is State law. *See generally* RSA 654:12. The mootness exception is inapplicable because no similarly situated person (once-registered voter, New Hampshire-born with a state-issued Real ID) will be required to present DPOC. *See Davis v. Coakley*, 802 F.3d 128, 133 (1st Cir. 2015) (explaining that "similarly situated" does not require exact correlation, but "apples should be compared to apples").

### B. The District Court Misapplied the Supreme Court's Standard for Facial Constitutional Challenges

This appeal will also likely succeed because the district court did not apply the correct standard for considering facial challenges. "[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). While some members of the Supreme Court have criticized that formulation, "all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep.'" *Id.* In determining whether a law is facially invalid, a court may not go beyond the law's facial requirements—it must not "speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange*, 552 U.S. at 449-50 (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)).

The Supreme Court disfavors facial challenges because they often rely upon speculation and barebone facts, they risk premature statutory interpretation, they may cause a court to anticipate constitutional questions or to formulate broader constitutional rules than necessary, and they threaten to short-circuit the democratic process. *See id.* at 450-51 (collecting cases). So, where plaintiffs ask a court to invalidate a state law in all its applications, plaintiffs "bear a heavy burden of persuasion." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 200 (2008)

(plurality). The district court did not apply the Supreme Court's rigorous standard governing facial constitutional challenges.

The Supreme Court has consistently held that where a law has broad application to all voters but does not impose "excessively burdensome requirements on any class of voters[,]" "it imposes only a limited burden on voters' rights." *See id.* at 202-03 (quoting *Storer v. Brown*, 415 U.S. 724, 738 (1974); *Burdick v. Takushi*, 504 U.S. 428, 439 (1992)) (quotations omitted). On its face, HB 1569 applies to all voters—no one is permitted to self-verify through QVAs or CVAs. *See* ECF No. 176 at 67 (noting QVA-repeal "impacts voters as a whole"). The trial did not produce any evidence of an identifiable individual or group who cannot register to vote or overcome a voter challenge. To the extent that Plaintiff-Appellees offered evidence of harm caused by HB 1569, the harm reflected ordinary and widespread inconveniences, *i.e.*, voters required to locate and produce proof of their voter eligibility. This is substantively the same subject of the Supreme Court's *Crawford* decision.

The district court acknowledged that Defendant-Appellants offered evidence of the State's interest in ensuring election integrity, safeguarding voter confidence, and protecting the public fisc, and that these are legitimate interests. *Id.* at 72-73. The court should have ended its inquiry there, because even if there were a subset of the population that could experience burdens greater than the general public,

that would be insufficient to invalidate the entirety of a duly enacted law on its face. *See Crawford*, 553 at 203 ("Finally we note that petitioners have not demonstrated that the proper remedy—even assuming an unjustified burden on some voters—would be to invalidate the entire statute.").

Instead, the district court examined a small subset of voters who may hypothetically experience a unique burden under HB 1569. *See, e.g.*, ECF 176 at 67 ("Although HB 1569's elimination of the QVA to prove citizenship impacts voters as a whole, it places an especially heavy burden on certain groups of voters."). It drew a distinction between "the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* at 60 n.20 (quoting *City of L.A. v. Patel*, 576 U.S. 409, 418 (2015) (analyzing the application of a law permitting warrantless searches)). The court's approach may have been consistent with some facial Fourth Amendment challenges, but this is not a Fourth Amendment case and HB 1569's provisions apply to ***all*** New Hampshire voters. *Compare Patel*, 576 U.S. at 418 ("The '[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects.'") (internal citations omitted) *with* RSA 654:12, I. In the generally applicable election law facial challenge context, the *Anderson-Burdick* framework does not permit a court to select only a subset of voters for inclusion on the burden-side of the analysis. *See Crawford*, 553 at 206 (Scalia, J., concurring). Indeed, "[t]hat was essentially

the approach of the *Burdick* dissenters, who would have applied strict scrutiny to the laws because of their effect on 'some voters.'" *See id.* (quoting *Burdick*, 504 U.S. at 446 (Kennedy, J., dissenting)). Consequently, HB 1569 cannot be invalid on its face "based on the mere possibility" that a certain subset of voters may face an indeterminable and untested level of burden. *See Wash. State Grange*, 552 U.S. at 455.

The district court's judgment reflects the very dangers that make facial challenges disfavored. The record shows that the vast majority of eligible voters can satisfy HB 1569's DPOC requirements, notwithstanding proof-of-citizenship through other reasonable documentation or in-state, out-of-state, or federal database verification. The trial court relied heavily upon the expert testimony of Professor Michael Herron to conclude otherwise. *See, e.g.*, ECF 176 at 13-14. But Professor Herron estimated that out of approximately 1.1 million voting-eligible residents, more than 98.33% possess DPOC. Trial Ex. 15, ¶ 176. He estimated that as few as 5,433 voters—but no more than 31,291 voters—must take affirmative steps to acquire DPOC. *See id.* Even assuming the estimates' accuracy, Prof. Herron concedes that these miniscule numbers are inflated. The estimated 1.67% DPOC-non-possession rate includes current and former registered voters. *See* ECF 157 at 20:11-15. It also includes eligible voters who hold state-issued driver's licenses, were born in New Hampshire, and have state-issued

divorce, name-change, and adoption certificates, orders, or decrees. *See id.* at 20:6-10, 15:4-17:10. These voters may possess DPOC not captured in Professor Herron's survey, and their citizenship will be readily confirmed by local election officials through State databases. *See id.*; RSA 654:12, VI.

The State has an indisputable interest in counting only the votes of eligible voters. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) ("A State indisputably has a compelling interest in preserving the integrity of its election process."). HB 1569 must have at least ***some*** constitutional applications. The district court, however, relied on speculative burdens experienced by third parties, where the facts of those purported burdens were undeveloped in the record. The district court also decided the case while a critical amendment to HB 1569 (HB 464) was being implemented, and it presumed that voters do not know the law—a presumption contrary to well-settled law. *See United States v. Hodson*, 77 U.S. 395, 409 (1870) ("Every one is presumed to know the law. Ignorance standing alone can never be the basis of a legal right."). The factual record also lacks contextual comparators. For example, all of the data regarding the organizations' registrations related to high-turnout elections which have not occurred since HB 1569 or HB 464 went into effect.

The Supreme Court requires district courts to analyze facial challenges by examining "the laws and their reasonably foreseeable effect on ***voters generally***."

*Crawford*, 553 U.S. at 205-06 (Scalia, J., concurring) (citing *Burdick*, 504 U.S. at 439, 436-37) (emphasis in original). In other words, where voters experience an ordinary and widespread burden caused by a nondiscriminatory voting law, the burden cannot be severe, regardless of how the requirement may affect any single voter. *See id.* at 206 (citing *Clingman v. Beaver*, 544 U.S. 581, 590-91 (2005)). This appeal will likely succeed because the Supreme Court requires a facial challenge to be evaluated by the law's impact on the whole electorate, not an anecdotal subset.

### C. The District Court Assigned Plaintiffs' Asserted Burdens Greater Constitutional Weight Than the Record Supports and Supreme Court Precedent Permits

Defendant-Appellants are likely to succeed on appeal because the district court departed from the *Anderson-Burdick* framework. It examined individualized burdens, contrary to the Supreme Court's direction to consider the law's reasonably foreseeable effect on the whole of the electorate. *See Crawford*, 553 U.S. at 205-06 (Scalia, J., concurring). The Supreme Court's *Anderson-Burdick* framework uses a two-track approach to determine the validity of a state election law. *See id.* at 204-05 ("Although *Burdick* liberally quoted *Anderson*, *Burdick* forged *Anderson*'s amorphous 'flexible standard' into something resembling an administrable rule…. Since *Burdick*, we have repeatedly reaffirmed the primacy of its two-track approach.") (internal citation omitted). A court must first ascertain

whether the burden on the plaintiff's right to vote is merely inconvenient, or whether it is severe. *See id.* at 205 (citing *Clingman*, 544 U.S. at 586-87).

If a challenged election law causes severe burdens on voters, burdens must be placed on the strict scrutiny track for comparison with a State's interests in the restriction. *Id.* The Supreme Court defines "severe burdens" as those that go beyond that which is merely inconvenient. *Id.* (citing *Storer v. Brown*, 415 U.S. 724, 728-729 (1974)). A generally applicable election law that requires nominal effort imposes ordinary and widespread burdens. *See id.* (citing *Clingman*, 544 U.S. at 591, 593-597). Such a law is merely inconvenient, so it does not warrant strict scrutiny. *See id.* Applying *Anderson-Burdick* to an inconvenient restriction does not require an extensive record or analysis of burdens. *See id.* at 208-09. This is so, because courts must identify the burdens experienced by the whole electorate—not a portion of it. *See id.* at 205-06 (citing *Burdick*, 504 U.S. at 439, 436-37). A court cannot select a subset of voters who may have greater difficulty complying with requirements to turn a nominal burden into a severe one. *See id.* at 205. Individualized or idiosyncratic "light and heavy burdens are no more than the different ***impacts*** of the single burden that the law uniformly imposes on all voters. *Id.* (emphasis in original). The Supreme Court has routinely "refute[d] the view that individual impacts are relevant to determining the severity of the burden it imposes." *Id.* at 205-06 (collecting cases).

In this case, the district court held that QVA-repeal will significantly burden some voters—particularly those who choose to wait until election day to register. *See* ECF No. 176 at 61. It also found no evidence of voters' reliance on CVAs to overcome eligibility challenges, but hypothesized that there could be future burdens experienced by some. *See id.* at 78, 87. These findings are inconsistent with the Supreme Court's two-track approach to the *Anderson-Burdick* framework. The court should not have attributed the personalized and idiosyncratic burdens of subsets of the population to the entire State electorate. *See Crawford*, 553 U.S. at 205-06 (2008) (Scalia, J., concurring).

The district court correctly noted that registrants cannot self-verify their eligibility after HB 1569, but the Supreme Court has explained that "every voting rule imposes a burden of some sort[.]" *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 670 (2021). For example, lawful voting foreseeably requires compliance with rules, time and attention, travel, following directions, and completing forms, among other things. *See id.* The Supreme Court has described these tradeoffs as the "usual burdens of voting" that voters must tolerate. *Id.* (citing *Crawford*, 553 U.S. at 198 (plurality opinion)). As a matter of law, the court below erred in finding that an incremental increase in voters' foreseeable and usual voting burdens qualified as a significant burden that required a strict scrutiny analysis track. *See Crawford*, 553 U.S. at 198 (plurality opinion) (plurality

opinion). This appeal will likely succeed because HB 1569 is a generally applicable, nondiscriminatory law that imposes nominal burdens on the electorate as a whole.

### D. The District Court Disregarded New Hampshire's Important Regulatory Interests Contrary to Supreme Court Precedent

Defendant-Appellants are likely to succeed on appeal because, as a matter of law, the district court should have held that New Hampshire's interest in counting only the ballots of eligible voters is, at a minimum, important. "There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Crawford*, 553 U.S. at 196 (plurality). "Consequently, there is a strong state interest in regulating all phases of the electoral process, including ballot access." *Perez-Guzman v. Gracia*, 346 F.3d 229, 238 (1st Cir. 2003) (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974); *Libertarian Party of Me. v. Diamond*, 992 F.2d 365, 370 (1st Cir. 1993)).

The court acknowledged that election integrity, safeguarding voter confidence, and protecting the public fisc are legitimate state interests. ECF 176 at 72-73. Nevertheless, the court scrutinized New Hampshire's interests in QVA-repeal in the context of whether HB 1569 provided a "safety valve" to mitigate voters' burdens. *See id.* at 73 (citing *Crawford*, 553 U.S. at 194-98 (plurality opinion); *Brnovich*, 594 U.S. at 678-86). The court fundamentally misapprehended the Supreme Court's dicta in the cases it cited. According to the

Supreme Court, the entire statutory election scheme must be analyzed because no provision can be understood outside the context of the whole. *See, e.g.*, *Burdick*, 504 U.S. at 441-42. The Supreme Court does not require election laws to have safety valves for unique individual circumstances where a law is generally applicable and nondiscriminatory. *See Crawford*, 553 U.S. at 206 (Scalia, J., concurring).

Notwithstanding, the Defendant-Appellants offered ample evidence of practical concerns regarding self-certifying affidavits. Whether cast accidentally or fraudulently, wrongful voting distorts elections. *See* ECF 160 at 125:18-24, 93:5-12. Unlawful ballots cannot be excised or discounted from the elections that they distort. *Id.* The State must prevent wrongful voting because single-digit vote-differentials routinely decide State elections, so even one unlawful ballot can directly impact the outcome of a race. *Id.* 121:5-18. Indeed, Deputy Secretary of State O'Donnell testified that in the most recent election cycle, a coin-flip decided one race because the candidates tied and remained tied after a recount. *Id.* He explained that "the presence of unlawful votes undermines people's confidence that the actual election results have integrity, are secure, and that they're fair and accurate results." *Id.*

Further complicating effective election administration is the inherent difficulty in detecting wrongful voting and the strain on State resources. Between

2016 and 2025, the Attorney General investigated 202 instances of suspected wrongful voting, nine of which involved suspected noncitizens. ECF 159 at 61:20-62:2, 62:7-15. Investigators found 49 instances of wrongful voting. ECF 160 at 5-10. Seven of the suspects were noncitizens who registered to vote a total of nine times. *Id.* 73:15-19, 90:13-91:4. HB 1569 protects State resources and bolsters election integrity by preventing wrongful voting from occurring in the first instance, avoiding investigations and enforcement actions. *Id.* 134:6-10; ECF 159 at 4:24-5:6.

The legislature chose to replace this *ex post* enforcement with an *ex ante* eligibility-verification process. HB 1569 cannot eliminate all wrongful voting, but its eligibility-verification requirement is an essential tool for establishing the validity of a ballot ***before*** it is cast. ECF 160 at 121:19-122:5. The Deputy Secretary explained that HB 1569 would have prevented several instances of wrongful voting confirmed by the Election Law Unit. *Id.* 122:6-17. HB 1569 "protect[s] the election from unlawful votes and also [serves] to increase confidence that the votes that are actually cast and counted are all lawful." *Id.* 121:1-4.

Controlling precedent required the district court to value New Hampshire's interest in regulating ballot access as "strong" (*Perez-Guzman*, 346 F.3d at 238) or "important" (*Burdick*, 504 U.S. at 435), but the court did not do so. *See* ECF 176

at 73 (describing interest in QVA-repeal as "abstract"), 82 (describing interest in CVA-repeal as "not advanced at all"). The Supreme Court has been clear that the right to vote "can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Rucho*, 588 U.S. at 731 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). This appeal will likely succeed because the district court significantly undervalued the State's interest in election integrity, as a matter of law.

### E. The Mandatory Injunction Exceeds the Limits of the District Court's Equitable Authority

Defendant-Appellants are likely to succeed on appeal because the district court awarded equitable relief extending further than necessary to afford Plaintiff-Appellees full relief. Without a doubt, federal courts may vindicate federal rights by commanding state actors to refrain from violating federal law. *Va. Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 255, 131 S. Ct. 1632, 1638 (2011)* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). That command, however, "must closely tailor injunctive relief to the specific harm alleged." *DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 423 (1st Cir. 2024) (citing *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 487 (1st Cir. 2009). So, equitable relief cannot extend further than necessary to afford a plaintiff with complete relief. *CASA*, 606 U.S. at 852. "Under this principle, the question is not whether an injunction offers complete relief to ***everyone*** potentially affected by an

allegedly unlawful act; it is whether an injunction will offer complete relief ***to the plaintiffs before the court***." *Id.* (emphasis in original) (quoting *Califano v. Yamasaki*, 442 U. S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief ***to the plaintiffs***." (emphasis added by *CASA* Court)).

Here, the court went much further than simply declaring HB 1569 unconstitutional and enjoining Defendant-Appellants from enforcing it. The mandatory injunction effectively reenacts provisions of a State law that was duly repealed through New Hampshire's legislative process. ECF No. 176 at 97. It compels the State to issue and rewrite defunct QVA and CVA State forms and resuscitate repealed processes. *Id.* at 97. This equitable relief exceeds the court's authority for at least two reasons.

First, not a single individual Plaintiff-Appellee (including the named Youth Movement members) will need a QVA to register or re-register to vote, so the injunction does not remedy their alleged harms. *See infra* Sec. I(A) (noting that each is a registered voter or has a birth certificate, passport, and state-issued ID). The individuals will also never use a CVA to overcome a challenge. *See id.* So, QVA and CVA availability is not necessary because the forms do not afford the Plaintiff-Appellees any relief.

Second, the injunction entirely displaces the policy choices made by voters' elected representatives. It is New Hampshire's constitutional prerogative to establish the time, places, and manner of holding elections. *See* U.S. Const. art. I, § 4. New Hampshire therefore regulates voter registration because it has a strong state interest. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013); *Perez-Guzman v. Gracia*, 346 F.3d 229, 238 (1st Cir. 2003). These are public policy choices where elected officials "weigh the costs and benefits of possible changes to their election codes, and their judgment must prevail unless it imposes a severe and unjustified overall burden upon the right to vote, or is intended to disadvantage a particular class." *Crawford*, 553 U.S. at 208 (Scalia, J., concurring).

If statutory fail-safes (*e.g.*, "other reasonable documentation" or government database-verification, RSA 654:12) are constitutionally insufficient, a federal court may so declare. But a federal district court cannot resurrect and impose ***repealed*** State law and mandate that State officials implement it. Were it otherwise, a federal court could substitute the ***judiciary's*** preferred State election administration policy for the State ***legislature's*** election administration policy. *See Ayotte v. Planned Parenthood*, 546 U.S. 320, 330, 126 S. Ct. 961, 968 (2006) ("a court cannot 'use its remedial powers to circumvent the intent of the legislature.'")

(quoting *Califano v. Westcott*, 443 U.S. 76, 94 (1979) (Powell, J., concurring in part and dissenting in part).

Perhaps a court could order the Defendant-Appellants to accept registrants who bring notarized sworn affidavits as proof of citizenship, or proof that a challenged voter's ballot is valid. Such a ruling would certainly be more narrowly tailored to the alleged injury and such documents could be taken as "other reasonable documentation" under the existing statute. But the current injunction impermissibly interferes with election administration by resurrecting repealed state policy without deliberating on its impact on the entire statutory scheme. *See id.* This appeal will likely succeed due to this overreach of the district court's equitable authority.

## II. New Hampshire Will Suffer Irreparable Harm Absent a Stay Because the Mandatory Injunction Displaces the State's Constitutional Prerogative to Administer Elections

On November 3, 2026, New Hampshire will conduct a statewide general election. Absent a stay, the State will suffer irreparable harm because the mandatory injunction prevents it from implementing its duly enacted laws and compels it to implement duly repealed laws. *See* ECF 176 at 97. The constitutional prerogative to establish the time, places, and manner of holding elections is the State's, and it must choose how to verify its elections' integrity. *See* U.S. Const. art. I, § 4; *Inter Tribal Council*, 570 U.S. at 9; *Perez-Guzman*, 346

F.3d at 238. "[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aero. Workers Local Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (collecting cases and quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). Here, the injunction is more intrusive and harmful than a typical order enjoining enforcement of a state law.

New Hampshire adopted a flexible, open-ended statutory requirement for verifying voters' eligibility. *See* RSA 654:12, I(a) (allowing "any other reasonable documentation which indicates the applicant is a United States citizen"). It must balance its same-day polling location registration and voting with its inability to recall or discount ballots later discovered to be invalidly cast. The injunction mandates reinstituting the affidavit system that the voters (through their elected representatives and chief executive) chose to abandon and requires the State to republish its repealed affidavits. The irreparability of the harm is clear.

## III. Plaintiffs Will Not Be Harmed by a Stay Because the Injunction Affords Plaintiffs Relief They Will Never Use

As discussed above, the individuals in this case, Miles Borne, A.M., and L.M., will never need a QVA to register or a CVA to vote, so they cannot be harmed by a stay pending appeal. Mr. Borne is already a registered voter. *See* ECF 176 at 56. A.M. and L.M. are not registered, but each possesses a state-issued

ID, a passport, and a birth certificate. ECF 132, ¶ 27. If either chooses to register, A.M. and L.M. will do so without executing a QVA. *See* RSA 654:12, I(a).

A voter challenge to any Plaintiff-Appellee's future ballot is improbable and purely hypothetical. Notwithstanding that the district court found "no evidence that any voter ever used a CVA to overcome another person's challenge to his eligibility to vote" (ECF 176 at 10), and not withstanding that the Individual Plaintiffs are not challenging CVA-repeal, it is worth noting that none of the individuals will ever use a CVA. Their names must appear on a voter checklist to be the subject of a challenge. RSA 659:13, I(a)-(b); RSA 659:27, I. That their names are on the checklist is *prima facie* evidence of their eligibility to vote. *See* RSA 654:12, III (voter registration in the SVRS is evidence of age and citizenship). A challenger must overcome that presumption for an election official to deem a challenge well-grounded. *See* RSA 659:27, II; RSA 659:27-a, II(a) (requiring personal knowledge or other basis of probable cause to include one or more of 10 enumerated "specific facts").

That should be dispositive, but there are other reasons they will never use a CVA to vote in the face of a successful challenge. Mr. Borne was born in New Hampshire and he has a New Hampshire Real ID. ECF 176 at 47; ECF 132, ¶¶ 1-8. Both the New Hampshire Vital Records and Motor Vehicles databases will confirm Mr. Borne's eligibility, if his ballot is challenged. RSA 654:12, III; RSA

5-C:9, X; RSA 263:40-a, V. Neither A.M. nor L.M. were born in New Hampshire, but they each have a New Hampshire Real ID. ECF 176 at 46; ECF 132, ¶¶ 24-25. So, in the unlikely event that their ballots are challenged sometime in the future, the Motor Vehicles database will confirm A.M.'s and L.M.'s voter eligibility. RSA 654:12, III; RSA 263:40-a, V. Even if the Court were inclined to look beyond the Plaintiff-Appellees to non-party individuals, the Plaintiff-Appellees did not offer any admissible evidence of any identifiable person who would be unable to vote without a QVA or a CVA. Accordingly, Plaintiffs will not suffer any harm from a stay.

## IV. The Public Interest Favors a Stay Because Federal Courts Should Not Enjoin Duly Enacted State Election Laws Before Appellate Review

The public expresses its interests through the laws its representatives enact. *See Atkin v. Kansas*, 191 U.S. 207, 223 (1903). The public interest is not abstract—it is indivisible from the law. *See Virginian Ry. Co. v. Sys. Fed.*, 300 U.S. 515, 552 (1937) ("The fact that Congress has indicated its purpose to make negotiation obligatory is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief."). Plaintiff-Appellees' expert Professor Herron estimated that just 1.67% of voting-eligible residents do not possess birth certificates, passports, naturalization papers, or certificates of citizenship. *See* ECF 157 at 18:19-22. As explained in Sec. I(B) above, this small subset vastly overstates who might use a QVA or CVA before Defendant-

Appellants' appeal will be decided. Professor Herron's estimate includes voting-eligible residents who: (1) are currently or who have previously been registered to vote here; (2) are New Hampshire-born; (3) have a New Hampshire-issued ID; (4) have marriage certificates or have been married in New Hampshire; (5) have adoption records or were adopted in New Hampshire; (6) have a divorce decree or were granted a divorce in New Hampshire; (7) have a court-ordered name change or were granted a name-change petition in New Hampshire; and/or (8) have other reasonable documentation of citizenship. ECF 157 at 16:5-20:15; Trial Ex. 15 at 59-62. For the fraction of the population that cannot satisfy HB 1569's requirements, the people's elected representatives chose a flexible system to account for unique circumstances. *See, e.g.*, RSA 654:12, II-a(b) (eff. July 2026) (authorizing vouchers for indigent people seeking documentary proof of citizenship).

"[T]he public interests imperatively demand – that legislative enactments should be recognized and enforced by the courts as embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the fundamental law of the Constitution." *Atkin*, 191 U.S. at 223. The Plaintiffs have not shown that HB 1569 is, on its face, "plainly and palpably, beyond all question" unconstitutional, let alone that they have standing to maintain this case. The public interest thus weighs heavily in favor of a stay pending appeal.

## CONCLUSION

For the reasons stated above, Defendant-Appellants respectfully request that the Court stay the district court's judgment until the appellate process has resolved the important questions of constitutional law presented here.

Respectfully submitted,

APPELLANTS DAVID M. SCANLAN,
in his official capacity as New Hampshire
Secretary of State and JOHN M.
FORMELLA, in his official capacity as
New Hampshire Attorney General

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date: August 5, 2026

*/s/ Michael P. DeGrandis*

Anthony J. Galdieri, Bar No. 1175480
New Hampshire Solicitor General
Matthew T. Broadhead, Bar No. 1173755
Associate Attorney General
Michael P. DeGrandis, Bar No. 1218329
Assistant Attorney General
anthony.j.galdieri@doj.nh.gov
matthew.t.broadhead@doj.nh.gov
michael.p.degrandis@doj.nh.gov

**CERTIFICATE OF COMPLIANCE**

On August 4, 2026, the First Circuit Court of Appeals granted Defendant-Appellants' Assented-To Motion to Enlarge Word Limit, enlarging the limit to 7,800 words. I hereby certify that the foregoing Motion for Stay complies with the word limit established by Federal Rule of Appellate Procedure 27(d)(2)(A) and enlarged by the Court, because the motion contains 7,758 words. This Motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it has been prepared using Microsoft Word for Microsoft 365 MSO (Version 2605 Build 16.0.20026.20166) 64-bit in 14-point Times New Roman typeface.

*/s/ Michael P. DeGrandis*
Michael P. DeGrandis

**CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. Participants in the case are represented by registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Michael P. DeGrandis*
Michael P. DeGrandis

**TABLE OF EXHIBITS**

| Exhibit | Record Reference | Description |
|---|---|---|
| **A** | ECF No. 50 | *Youth Movement*, First Am. Compl. |
| **B** | ECF No. 85 | *Open Democracy*, First Am. Compl. |
| **C** | ECF No. 132 | Joint Stipulation of Facts |
| **D** | ECF No. 143 | Trial Transcript |
| **E** | ECF No. 150 | Trial Transcript |
| **F** | ECF No. 152 | Trial Transcript |
| **G** | ECF No. 154 | Trial Transcript |
| **H** | ECF No. 157 | Trial Transcript |
| **I** | ECF No. 159 | Trial Transcript |
| **J** | ECF No. 160 | Trial Transcript |
| **K** | ECF No. 176 | Order (Findings & Conclusions) |
| **L** | Trial Ex. 15 | Expert Report (Dr. Michael C. Herron) |
| **M** | Trial Ex. SS | Election Procedure Manual (2024) |