**No. 26-1740**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

NEW HAMPSHIRE YOUTH MOVEMENT, *Plaintiff-Appellee*

v.

DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State, *Defendant-Appellant*

and

COALITION FOR OPEN DEMOCRACY; LEAGUE OF WOMEN VOTERS OF NEW HAMPSHIRE; THE FORWARD FOUNDATION; MILES BOURNE, A.M. by his next friend Russell Muirhead; and L.M. by her next friend Russell Muirhead, *Plaintiffs-Appellees*

and

McKENZIE TAYLOR and DECEMBER RUST, *Plaintiffs*

v.

DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State, and JOHN M. FORMELLA, in his official capacity as New Hampshire Attorney General, *Defendants-Appellants*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE
No. 24-cv-291-SE

# ***OPEN DEMOCRACY*** **PLAINTIFFS-APPELLEES' OPPOSITION TO DEFENDANTS-APPELLANTS' MOTION FOR STAY PENDING APPEAL**

---

Henry Klementowicz, No. 1179814
Gilles R. Bissonnette, No. 123868
Maria D. Savarese, No. 1223427
AMERICAN CIVIL LIBERTIES
UNION OF NEW HAMPSHIRE
FOUNDATION
18 Low Avenue
Concord, NH 03301
(603) 333-2201
henry@aclu-nh.org
gilles@aclu-nh.org
maria@aclu-nh.org

Jacob van Leer, No. 1218321
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street NW Washington, D.C.
20005
(202) 715-0815
jvanleer@aclu.org

Ming Cheung, No. 1218322
Clayton Pierce, No. 1218300
Ethan Herenstein, No. 1221386
Davin Rosborough, No. 1224907
Sophia Lin Lakin, No. 1214581
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street New York, NY 10004
(212) 549-2500
mcheung@aclu.org
cpierce@aclu.org
eherenstein@aclu.org
drosborough@alcu.org
slakin@aclu.org

Geoffrey M. Atkins, No. 1218320
John T. Montgomery, No. 41751
Stephanie A. Ainbinder, No. 1194805
ROPES & GRAY LLP

Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000
Geoffrey.Atkins@ropesgray.com
John.Montgomery@ropesgray.com
Stephanie.Ainbinder@ropesgray.com

Alex H. DiLalla, No. 1224906
ROPES & GRAY LLP
191 N Wacker Dr, 32nd Floor
Chicago, IL 60606
(312) 845-1200
Alex.DiLalla@ropesgray.com

*Counsel for* Open Democracy *Appellees*

# Table of Contents

**Page**

INTRODUCTION ....................................................................................1

STATEMENT .........................................................................................2

I. HB 1569 Eliminated Affidavits that Allowed Voters to Prove Citizenship and Respond to Election Day Eligibility Challenges. ........................................2

II. The District Court Held HB 1569's QVA and CVA Repeals Unconstitutional and Denied a Stay ....................................................6

ARGUMENT ..........................................................................................7

I. Defendants Have Not Shown Irreparable Harm Absent a Stay. ..........................8

II. Defendants Are Unlikely to Succeed on the Merits. ........................................10

A. Defendants Are Unlikely to Succeed in Showing that Plaintiffs Lack Standing ........................................................................10

1. Defendants Will Not Succeed in Showing the Organizational Plaintiffs Lack Standing ....................................................10

2. Defendants Will Not Succeed in Showing the Individual Plaintiffs Lack Standing ....................................................13

B. The District Court Applied the Correct Legal Standards and Defendants Have Forfeited Any Argument Otherwise ...........................16

1. The District Court Correctly Applied the Anderson-Burdick Framework as Articulated in Crawford .......................................17

2. Defendants Have Forfeited Any Argument That a Different Legal Standard Applies ....................................................22

C. The District Court Correctly Weighed the Evidence in Finding the Challenged Provisions Unconstitutional ................................................24

D. The Scope of the District Court's Injunction Was Proper and Necessary to Afford Complete Relief to Plaintiffs .................................29

III. The Equities and Public Interest Strongly Counsel Against a Stay ....................32

CONCLUSION ........................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze*,
460 U.S 780. (1983) ........ 18, 21

*Associated Press v. State*,
153 N.H. 120 (2005) ........ 30

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020) ........ 30

*Beame v. Friends of the Earth*,
434 U.S. 1310 (1977) (Marshall, J., in chambers) ........ 8

*Brakebill v. Jaeger*,
932 F.3d 671 (8th Cir. 2019) ........ 14, 20

*Bullock v. Carter*,
405 U.S. 134 (1972) ........ 21

*Burdick v. Takushi*,
504 U.S. 428 (1992) ........ 17

*Bush v. Gore*,
531 U.S. 98 (2000) ........ 32

*Caicedo v. DeSantis*,
2024 WL 4729160 (M.D. Fla. Nov. 8, 2024) ........ 12

*California v. Trump*,
2026 WL 2144084 (1st Cir. July 25, 2026) ........ 34

*Coalition for Open Democracy v. Scanlan*,
794 F. Supp. 3d 28 (D.N.H. 2025) ........ 3, 11, 14, 15

*Comfort v. Lynn Sch. Comm.*,
418 F.3d 1 (1st Cir. 2005) (en banc) ........ 10

*Common Cause R.I. v. Gorbea*,
970 F.3d 11 (1st Cir. 2020)........................................................................*passim*

*Common Cause/Georgia v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ....................................................................14

*CoxCom, Inc. v. Chaffee*,
536 F.3d 101 (1st Cir. 2008)........................................................................13

*Democracy N.C. v. Hirsch*,
2025 WL 4033053 (M.D.N.C. July 21, 2025)..................................................12

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025)......................................................................................13

*Eakin v. Adams Cnty. Bd. of Elections*,
149 F.4th 291 (3d Cir. 2025) .........................................................................20

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)..........................................................................10, 11, 13

*FEC v. Wis. Right to Life, Inc.*,
551 U.S. 449 (2007)......................................................................................16

*Feldman v. Ariz. Sec'y of State's Off.*,
843 F.3d 366 (9th Cir. 2016) .........................................................................20

*Fish v. Schwab*,
957 F.3d 1105 (10th Cir. 2020) ...................................................14, 18, 20, 27

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)......................................................................................31

*Get Loud Ark. v. Jester*,
171 F.4th 1058 (8th Cir. 2026), *pet. for reh'g en banc denied*, No.
24-2810, 2026 WL 1459895 (8th Cir. May 22, 2026) .......................................12

*Greater Birmingham Ministries v. Sec'y of State for Ala.*,
992 F.3d 1299 (11th Cir. 2021) ....................................................................20

*Harper v. Va. State Bd. of Elections*,
383 U.S. 663 (1966)......................................................................................21

*Hyde Park Partners, L.P. v. Connolly*,
839 F.2d 837 (1st Cir. 1988)....................34

*League of United Latin Am. Citizens v. Exec. Off. of President*,
808 F. Supp. 3d 29 (D.D.C. 2025)....................11

*League of Women Voters of N.H. v. Kramer*,
2025 WL 919897 (D.N.H. Mar. 26, 2025)....................12

*League of Women Voters of Ohio v. LaRose*,
741 F. Supp. 3d 694 (N.D. Ohio 2024)....................12

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)....................33

*Libertarian Party of N.H. v. Gardner*,
638 F.3d 6 (1st Cir. 2011)....................17, 18

*Mullane v. DOJ*,
113 F.4th 123 (1st Cir. 2024)....................15, 22, 23

*N.E. Ohio Coal. for Homeless v. Husted*,
696 F.3d 580 (6th Cir. 2012)....................32

*Nat'l Treasury Emps. Union v. United States*,
101 F.3d 1423 (D.C. Cir. 1996)....................11

*New Hampshire Youth Movement v. Scanlan*,
No. 1:24-cv-00291 (D.N.H. filed Sep. 17, 2024)....................1

*New Hampshire Youth Movement v. Scanlan*,
2026 WL 1500857 (D.N.H. May 28, 2026)....................*passim*

*New Jersey v. Trump*,
131 F.4th 27 (1st Cir. 2025)....................9

*Nken v. Holder*,
556 U.S. 418 (2009)....................7, 8, 32

*Obama for Am. v. Husted*,
697 F.3d 423 (6th Cir. 2012)....................33

*Rhode Island v. Trump*,
155 F.4th 35 (1st Cir. 2025) .......... 7, 31

*Rose v. Raffensperger*,
143 S. Ct. 58 (2022) .......... 33

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
217 F.3d 8 (1st Cir. 2000) .......... 29

*Shaw v. Smith*,
166 F.4th 61 (10th Cir. 2026) .......... 32

*Somerville Pub. Sch. v. McMahon*,
139 F.4th 63 (1st Cir. 2025) .......... 9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 10

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 32

*United States v. Johnson*,
467 F.3d 56 (1st Cir. 2006) .......... 20

*United States v. Rutherford*,
442 U.S. 544 (1979) .......... 31

*United States v. Slade*,
980 F.2d 27 (1st Cir. 1992) .......... 16, 22

*Va. Coal. for Immigrant Rts. v. Beals*,
803 F. Supp. 3d 454 (E.D. Va. 2025) .......... 12

*Vázquez-Rivera v. Figueroa*,
759 F.3d 44 (1st Cir. 2014) .......... 31

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*,
645 F.3d 26 (1st Cir. 2011) .......... 8

*Voice of the Experienced v. Ardoin*,
813 F. Supp. 3d 600 (M.D. La. 2025) .......... 12

**Statutes**

RSA 654:12 .......... 15

199th Leg., Reg. Sess. (N.H. 2026) (passed May 2026, effective July 2026) .......... 15

**Other Authorities**

President of the United States, https://www.sos.nh.gov/sites/g/files/ehbemt561/files/inline-documents/sonh/2024-ge-president_3.xls (last visited August 17, 2026) .......... 25

State, Secretary of State David Scanlan Issues Statement Following District Court's Ruling on HB 1569 (May 29, 2026), https://mm.nh.gov/files/uploads/sos/docs/5-29-26-secretary-of-state-issues-statement-on-hb-1569.pdf .......... 7

## INTRODUCTION

After a nine-day trial, featuring oral and stipulated testimony from 26 witnesses and a voluminous evidentiary record, the district court issued its 98-page opinion. Applying well-settled legal standards, the court meticulously explained how "HB 1569's eliminations of the Qualified Voter Affidavit [("QVA")] and the Challenged Voter Affidavit [("CVA")] significantly burden eligible New Hampshire voters' rights to vote," and how "[e]liminating those affidavits does little, if anything, to further the state's interests." Order ("Op."), at 4, Dkt.176.[1] The court declared the relevant provisions unconstitutional and permanently enjoined Defendants from enforcing them.

Ten weeks later, Defendants arrive at this Court to demand a stay, mounting arguments that reveal a complete misapprehension of the trial record and governing law. Defendants ignore the mountains of burden evidence and gloss over their own witnesses' concessions regarding state interests. They even neglect to address Plaintiffs' entire (successful) procedural due process claim. Defendants' legal theories seek to rewrite history, willfully disregarding controlling voting rights law and pretending instead that a concurrence's rejected theories have long carried the

[1] References to "Dkt." are to the consolidated district court docket, *New Hampshire Youth Movement v. Scanlan*, No. 1:24-cv-00291 (D.N.H. filed Sep. 17, 2024).

day. They concoct novel, forfeited positions that they failed to timely present to the district court.

Defendants' effort fails at each juncture. Their extensive delays cut against any finding of irreparable harm, as does their goal of reinstating unconstitutional provisions. They are unlikely to succeed on the merits of their attempts to ignore the factual record, rewrite standing precedent, overrule the *Anderson-Burdick* balancing test, and prevent the district court from crafting complete relief. The equities favor Plaintiffs, who would suffer irreparable harm from a stay, and the public interest favors protecting the fundamental right to vote.

This Court should deny Defendants' request for a stay pending appeal.

## STATEMENT

### I. HB 1569 Eliminated Affidavits that Allowed Voters to Prove Citizenship and Respond to Election Day Eligibility Challenges.

The district court's decision does not change New Hampshire's citizenship requirement to vote. Op.1-2.

Before HB 1569, New Hampshire offered various methods to prove citizenship, including a qualified voter affidavit ("QVA") that allowed registrants without documentary proof of citizenship ("DPOC") in hand to attest to their citizenship "under the penalties for voting fraud." Op.7-8. Additionally, voters subject to an eligibility challenge on Election Day could complete a Challenged Voter Affidavit ("CVA") attesting to their qualifications and cast a ballot. Op.9-10.

HB 1569 eliminated the QVA and CVA. Open Democracy Plaintiffs[2] sued the Secretary of State and the Attorney General, challenging HB 1569's elimination of those safeguards. Op.2-4; Dkt.85 ¶¶ 92-116. The district court largely denied Defendants' standing-based motion to dismiss, *Coalition for Open Democracy v. Scanlan*, 794 F. Supp. 3d 28 (D.N.H. 2025), consolidated Plaintiffs' challenge and the *N.H. Youth Movement* case, Dkt.78, denied Defendants' standing-based summary judgment motion, Dkt.135, and held a nine-day bench trial.

**Affidavit reliance.** Based on Plaintiffs' unrebutted expert evidence and multiple fact witnesses, the court found thousands of voters rely on the QVA to register and vote. Between April 29 and November 10, 2024, 14,737 registrants used QVAs to prove citizenship—more than 10% of all registrants and approximately 16.8% of first-time registrants. Op.8, 61. More than 10,000 voters used QVAs on Election Day in November 2024. Op.61.

**DPOC access barriers.** The court found that many eligible voters cannot use DPOC to register to vote because they do not possess DPOC, cannot retrieve it quickly, or do not have a document matching their current legal name. Op.13-14, 62-63. The court credited Dr. Michael Herron's "conservative estimate" that as

---

[2] Coalition for Open Democracy, League of Women Voters of New Hampshire ("LWV-NH"), The Forward Foundation ("Organizational Plaintiffs"), Miles Borne, Alexander Muirhead, and Lila Muirhead ("Individual Plaintiffs").

many as 59,583 eligible NH voters do not have DPOC, and 153,213 more might have DPOC but are unable to easily access it. Op.13.

HB 1569 particularly harms young voters, who are more often new registrants relying on a QVA, and married women, whose DPOC does not match their current names at a 15:1 ratio compared to men. Op.67-68.

**Voters turned away.** Even in low-turnout town elections in 2025, many voters were turned away because of HB 1569. In the March town elections, a poll-observing organization documented at least 49 voters turned away specifically for lacking DPOC and 55 more who might have been turned away for similar reasons, despite operating in limited areas. Op. 15, 19; Dkt.154, Trial Tr. 88:12-17, 108:11-109:17, 140:7-9. The organization saw at least 90 turned away in the fall city elections, "overwhelmingly" for lack of DPOC. Op.15-16. Overall, the district court found these incomplete figures undercounted the scale of disenfranchisement, because the State declined to track disenfranchised voters and the observers could not cover most polling places. Op.18-19.

**Limited and ineffective mitigation efforts.** HB 464, passed after HB 1569, attempted to lessen the burden of providing DPOC for certain categories of voters, but it did not restore the QVA. Op.22-23. The court found that HB 464 "only help[s] a subset of registrants": database searches would not locate birth certificates for the more than 60% of New Hampshire residents born elsewhere, reach out-of-state

marriage or divorce records showing name changes, or reliably assist the tens of thousands of voters who register with out-of-state identification or the 118,000 with no New Hampshire license on file. Op.26-28, 68-70. Further, bungled implementation of HB 464 and limited access to databases hamstrung its effectiveness. Op.68-72 (detailing deficiencies). The court concluded that Defendants' efforts "will not meaningfully reduce the burden HB 1569 placed on voters." Op.72.

Defendants slip in references (at 1, 12, 33) to the *post-trial* creation of other "options"—including a limited voucher program to help indigent voters pay for documentation—and inaccurately represent them as part of the state's 2024 "QVA-repeal." But HB 365 (2026), which made this amendment, took effect *after* the court's injunction and is not part of the record. (Of course, thanks to the court's injunction, indigent voters can once again much more easily use QVAs.) In any event, this amendment is yet another selectively applied band-aid that would have failed to address the unequal and unnecessary burdens imposed by HB 1569. The court already explained why database checks and a similar *ad hoc* program offering "free copies of birth certificates for voting purposes" did "far too little to change the court's analysis in any meaningful way." *See* Op.23, 68.

## II. The District Court Held HB 1569's QVA and CVA Repeals Unconstitutional and Denied a Stay

On May 28, 2026, the court declared that HB 1569's repeal of the QVA to prove citizenship violated the First and Fourteenth Amendments; that its repeal of the CVA for voter challenges violated those same Amendments; and that the CVA's repeal independently denied procedural due process. Op.96-97. The court permanently enjoined Defendants from enforcing those provisions. *Id*.

The injunction did not create a new voting regime; rather, it restored the relevant *status quo ante*. Op.96-97. Secretary Scanlan and his office have since repeatedly and publicly assured New Hampshire residents that they *will* be able to register and vote using the QVA and CVA for elections this year. When asked about the 2026 September and November elections, Scanlan stated, "[W]e will be conducting the registration process at state elections the way we have done in the past, which means a voter can come into the polling place and use an affidavit to prove certain qualifications." Dkt.189 at 2-3 & n.1. The Secretary's Office has published official guidance stating that it had "reimplement[ed] the use of the

[QVA]" such that "voters may now prove citizenship using an affidavit."[3] The Secretary also issued similar guidance to local election officials. Dkts.189-1, 189-2.

Three weeks after the injunction, Defendants noticed their appeal and moved for a stay in the district court. Dkts.181, 182. The district court denied the motion on July 22 for the reasons set forth in Plaintiffs' opposition. *See* July 22, 2026, Endorsed Order. Now, ten weeks after the injunction, Defendants seek a stay from this Court, with the September 8 primary mere weeks away. At no point have Defendants sought expedited procedures.

## ARGUMENT

The "extraordinary" relief of a stay pending appeal represents an "intrusion into the ordinary processes of administration and judicial review." *Rhode Island v. Trump*, 155 F.4th 35, 41 (1st Cir. 2025). This Court considers: (1) if the applicant has made "a strong showing" of likelihood of success on the merits; (2) if the applicant will face irreparable injury "absent a stay"; (3) whether a "stay will substantially injure the other parties"; and (4) "where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009); *see Common Cause R.I. v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020) (denying stay and holding "[i]t is not enough that the chance

[3] Press Release, N.H. Sec'y of State, Secretary of State David Scanlan Issues Statement Following District Court's Ruling on HB 1569 (May 29, 2026), https://mm.nh.gov/files/uploads/sos/docs/5-29-26-secretary-of-state-issues-statement-on-hb-1569.pdf.

of success on the merits be better than negligible" and "simply showing some possibility of irreparable injury fails" to suffice (quoting *Nken*, 556 U.S. at 434-35)).

## I. Defendants Have Not Shown Irreparable Harm Absent a Stay.

Defendants' delay undercuts their claim of irreparable harm, and regardless they cannot be harmed by an injunction against enforcement of unconstitutional restrictions.

*First*, this Court should deny the stay because of Defendants' "failure to present promptly." Loc. R. 27.0(b). Their "leisurely pace and lack of urgency undercut a presumption of irreparable harm." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 36 (1st Cir. 2011); *see Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (Marshall, J., in chambers) (20-day delay in seeking stay "vitiates much of the force of their allegations of irreparable harm").

Defendants sat on their hands in the district court and this Court. They waited three weeks after the injunction to seek a stay in the district court, without requesting expedited briefing. After the district court denied that motion, they waited another two weeks—nearly two-and-a-half months after entry of the injunction—to seek relief from this Court, again without requesting expedited briefing. This lackadaisical pace belies any claim of irreparable harm.

*Second*, Defendants suggest (at 29) "the State will suffer irreparable harm" from not being able to implement "its duly enacted laws." But this circular argument

would shield *any* unlawful statute. The government cannot establish irreparable harm from an injunction barring enforcement of unlawful government action. *See Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 74–75 (1st Cir. 2025); *New Jersey v. Trump*, 131 F.4th 27, 41–44 (1st Cir. 2025).

Moreover, the undisputed facts show that the pre-HB 1569 affidavit system was effective and restoring it does not harm any state interests. Op.74-75. Prior to HB 1569, "New Hampshire already had one of the strictest voting regimes in the country," Op.5, and required proof of citizenship. A "sworn affidavit capable of exposing an affiant to criminal prosecution is a method of proving citizenship and not an exception to that requirement." Op.1-2. "HB 1569 did not reduce reports of wrongful voting," Op.35, and Defendants agree that non-citizen voting in New Hampshire has always been "miniscule," Op.34, foreclosing any claim that the State now faces an increased risk of fraud, *see Common Cause R.I.*, 970 F.3d at 15 (finding claims about "fraudulent ballots" due to a lack of witness signature "dubious as a matter of fact and reality"). Further, HB 1569 was not retroactive—thus, the injunction does not change that all voters who registered prior to its implementation were never barred from using QVAs to register.

Given Defendants' delay and their lack of harm from unconstitutional portions of a law being enjoined, they have failed to show irreparable harm in proceeding under the normal schedule. This alone is reason to deny the stay.

## II. Defendants Are Unlikely to Succeed on the Merits.

Defendants have also failed to make a strong showing of a likelihood of success on the merits.

### A. Defendants Are Unlikely to Succeed in Showing that Plaintiffs Lack Standing.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) ("*AHM*") (citation omitted). "If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." *Id.* at 381.

These requirements are easily satisfied here. And this Court need only find that "one plaintiff has standing to seek a particular form of global relief." *Comfort v. Lynn Sch. Comm.*, 418 F.3d 1, 11 (1st Cir. 2005) (en banc).

#### 1. Defendants Will Not Succeed in Showing the Organizational Plaintiffs Lack Standing.

The district court correctly held that the Organizational Plaintiffs have standing because HB 1569's repeal of the QVA and CVA directly impedes their core voter registration, voter education, and poll observation activities and forces a

consequent drain of resources. Op.50-55; *see also* Dkt.135 (denying motion for summary judgment on standing); *see also Coal. for Open Democracy*, 794 F. Supp. 3d at 39-44 (denying in relevant part motion to dismiss on standing).

That holding follows directly from the Supreme Court's decision in *AHM*. *AHM* draws a straightforward line. An organization cannot establish standing merely because it spends resources opposing a government policy. But an organization *does* suffer an injury when government action "directly affect[s] and interfere[s] with" its "core business activities." *Id.* at 395. As Defendants' own authority recognizes (at 10-11), the distinction is between an abstract conflict with an organization's mission and government action that "has made the organization's *activities* more difficult." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429-30 (D.C. Cir. 1996).

Courts have repeatedly applied this distinction after *AHM* to find organizational standing where election laws interfere with voter organizations' core activities. *See, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 57-58 (D.D.C. 2025) (holding the League of Women Voters and other organizations had standing to challenge executive order imposing a documentary proof-of-citizenship requirement because it "would directly interfere

with their core activities, including providing voter registration services throughout the Nation").[4]

That is precisely what the district court found here. HB 1569 did not merely prompt Plaintiffs to spend money opposing a law they dislike. It changed the legal conditions under which they perform their core work, thus "impair[ing] Open Democracy's ability to provide its core services" and causing it to expend resources. Op.50-51. Far from mere "issue advocacy," Open Democracy provides assistance with registration and voting, including hosting high school voter-registration drives and deploying poll observers across the State. Op.41-43. Due to HB 1569, Open Democracy was "able to help fewer" students register, its poll-observation services were far less effective absent massive expansions, and it had to divert resources to update its materials and expand those poll-observing efforts. *Id.*; *see id.* at 50-52; Dkt.135 at 16-19 (describing court's reasoning in greater detail). The remaining

[4] *See also Get Loud Ark. v. Jester*, 171 F.4th 1058, 1064 (8th Cir. 2026), *pet. for reh'g en banc denied*, No. 24-2810, 2026 WL 1459895 (8th Cir. May 22, 2026); *Va. Coal. for Immigrant Rts. v. Beals*, 803 F. Supp. 3d 454, 465 (E.D. Va. 2025); *Voice of the Experienced v. Ardoin*, 813 F. Supp. 3d 600, 640-41 (M.D. La. 2025); *Democracy N.C. v. Hirsch*, 2025 WL 4033053, at *2 (M.D.N.C. July 21, 2025); *League of Women Voters of N.H. v. Kramer*, 2025 WL 919897, at *9-10 (D.N.H. Mar. 26, 2025); *League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694, 707 n.3 (N.D. Ohio 2024); *Caicedo v. DeSantis*, 2024 WL 4729160, at *5 (M.D. Fla. Nov. 8, 2024).

Organizational Plaintiffs—LWV-NH and The Forward Foundation—experienced similar harms. *Id.* at 43-46, 54-55, Dkt.135 at 19-20.

Defendants' contention (at 10) that Plaintiffs' work technically "continues" misses the point. An organization need not cease performing a core activity; the relevant question is whether the government has "perceptibly impaired" it. *See AHM*, 602 U.S. at 395 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, at 379 (1982)). The district court found HB 1569 did exactly that. And the injury-in-fact requirement does not require "a particularly damaging injury." *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 107 (1st Cir. 2008) (citation omitted). A business, for example, does not lack standing merely because it continues operating after a law makes its operations more costly. *See, e.g.*, *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 113-14 (2025) (businesses had standing where regulation caused fewer sales, despite continued operations). In any event, HB 1569 did more than make Plaintiffs' work more difficult: it wholly prevented Plaintiffs from registering many eligible voters whom they otherwise would have helped. Op.51.

Because the district court correctly applied *AHM*, Defendants have not shown a likelihood of success on their standing challenge.

**2. Defendants Will Not Succeed in Showing the Individual Plaintiffs Lack Standing.**

The Individual Plaintiffs have standing to challenge HB 1569's removal of the QVA. Minors Lila and Alexander Muirhead seek to register to vote when they

turn 18. "Prior to HB 1569, the Muirheads would have been able to register to vote by submitting a QVA to prove their citizenship. Now, they are required to produce DPOC." Op.55. This itself "constitutes an injury sufficient to confer standing." *Id.* The same was true of Miles Borne at the time the complaint was filed. Op.56. The district court's ruling is firmly in line with the national consensus: The burden of being forced to satisfy an eligibility requirement—whether citizenship papers or photo identification—is itself a cognizable injury. *See, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1120 (10th Cir. 2020) ("[T]he requirement that [plaintiff] provide DPOC is sufficient to establish standing."); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009) ("[T]he lack of an acceptable photo identification is not necessary to challenge a statute that requires photo identification"); *Brakebill v. Jaeger*, 932 F.3d 671, 677 (8th Cir. 2019) (similar). Defendants cite no law to the contrary. In fact, they "conceded at oral argument that 'even just pulling' a documentary form of citizenship 'out of your back pocket' can create an injury sufficient to establish standing." *See Coal. for Open Democracy*, 794 F. Supp. 3d at 46 (transcript citation omitted).

Defendants' three counterarguments are meritless.

*First*, they argue (at 12-13) that Plaintiffs suffer a mere generalized grievance because they "prefer" a QVA but have not shown that "alternatives to QVAs are more burdensome to them." But the district court properly rejected this "magnitude

of the burden" argument because it "conflates standing with the merits of the claim." *Coal. for Open Democracy*, 794 F. Supp. 3d at 46. "Standing does not require such a comparison point; instead, it merely requires that the plaintiff be adversely affected or aggrieved, which can be established through an identifiable trifle." *Id.* (cleaned up) (collecting cases). Defendants' attempt to sneak in a *post-trial* amendment to RSA 654:12, II-a, *see* H.B. 365, 199th Leg., Reg. Sess. (N.H. 2026) (passed May 2026, effective July 2026), is neither part of the record, nor would it be relevant to Plaintiffs' standing for these same reasons.

*Second*, they argue (at 13-14) that "QVAs are useless to the Individual Plaintiffs" because they could not use a QVA "without lying on the government form" about their access to DPOC. This argument fails for two reasons. At the outset, the premise was forfeited below. *See Mullane v. DOJ*, 113 F.4th 123, 132 (1st Cir. 2024). Defendants first raised this novel factual contention that the Individual Plaintiffs are ineligible to use QVAs—because they might otherwise obtain DPOC—in their district court stay brief. *See* Dkt.182-1 at 10-11. Defendants did not dispute Individual Plaintiffs' eligibility to use a QVA at *any point* in advance of trial—not in their motion to dismiss, Defs.' Mot. to Dismiss, *Coal. for Open Democracy*, No. 1:24-cv-00312 (D.N.H. Jan. 16, 2025), Dkt.36-1, summary judgment motion, Dkt.88-1, or their pretrial statement of defenses, Dkt.124—nor at *any point* during trial or in post-trial briefing, *see* Dkts. 168, 169. Defendants "may

not unveil" this newfound view of QVAs "in the court of appeals." *United States v. Slade*, 980 F.2d 27, 30 (1st Cir. 1992) (collecting cases).

Even if not forfeited, Defendants' new QVA-usage position is a post-hoc fabrication contradicted by the trial record. The Secretary's own Election Procedure Manual directs that "[i]n the event an applicant does not have proof documents *with him or her when registering*, the applicant is entitled to use an affidavit to prove qualifications. The right to use an affidavit applies equally where the applicant does not possess the proof document anywhere and where the applicant possesses the proof document *but did not bring it when registering*." Trial Ex. SS at 185 (emphasis added). Prior to HB 1569, the Secretary's own guidance would have required officials to register Individual Plaintiffs using a QVA.

*Third*, Defendants argue (at 14) that Miles Borne's claim is moot because he is now registered to vote and when he re-registers in the future, "[h]e will never present documents or execute a QVA again." But election law cases routinely "fit comfortably within the exception to mootness for disputes capable of repetition, yet evading review," *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007), and the district court correctly held that Borne met both prongs of this exception, Op.57-58.

### B. The District Court Applied the Correct Legal Standards and Defendants Have Forfeited Any Argument Otherwise.

The parties have long agreed that Plaintiffs' right-to-vote claims are governed by the *Anderson-Burdick* framework. *See, e.g.*, Op.58-59 (noting agreement on

standard). The district court correctly applied that well-established test, as set forth in the controlling opinion of *Crawford v. Marion County Election Board*, the Supreme Court's most recent ruling on this subject. 553 U.S. 181, 190 (2008) (plurality). Defendants now contend (at 17-20) that the district court applied the wrong legal standard, arguing that impacts on particular classes of voters are irrelevant under Justice Scalia's non-controlling, concurring opinion in *Crawford*—an argument that Defendants never advanced to the district court before it issued its findings of fact and conclusions of law. That argument misconstrues the law and, not having been timely presented below, cannot be raised for the first time on appeal.

### 1. The District Court Correctly Applied the Anderson-Burdick Framework as Articulated in Crawford.

Under the *Anderson-Burdick* framework, "a court evaluating a constitutional challenge to an election regulation [must] weigh the asserted injury to the right to vote against the 'precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Crawford*, 553 U.S. at 190 (plurality) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). With this "flexible standard," the "rigorousness of [the court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. This Court and its sister circuits have uniformly applied this "sliding scale" test. *Libertarian Party of N.H. v.*

*Gardner*, 638 F.3d 6, 14 (1st Cir. 2011); *see Fish*, 957 F.3d at 1124 (collecting cases).

In determining a burden's severity, courts look to impacts on affected voters broadly, along with any special burdens on particular groups. *See Crawford*, 553 U.S. at 198-99 (plurality) (considering burdens on all eligible persons who "do not possess [qualifying] identification" and weighing whether any "heavier burden may be placed on a limited number of persons"). Then, the court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule," and consider "the extent to which those interests make it necessary to burden the plaintiff[s'] rights." *Anderson v. Celebrezze*, 460 U.S 780. at 789 (1983); *see Common Cause R.I.*, 970 F.3d at 15.

Here, the district court correctly adhered to the principles articulated by Justice Stevens' plurality opinion in *Crawford* when concluding that HB 1569 impermissibly burdened the constitutional right to vote. *See* Op.78, 83-84. Like the district court here, the *Crawford* plurality deemed it appropriate to analyze both the burdens on all voters "who are eligible to vote but do not possess" the required documentation *and* the "heavier burden" faced by "class[es] of voters" who may have even greater difficulty complying with the challenged law, including "elderly persons born out of State," people with "economic or other personal limitations, . . .

homeless persons; and persons with a religious objection to being photographed." 553 U.S. at 198-200 (plurality).

The district court followed this framework to a T. It analyzed HB 1569's impact on voters as a whole and on certain classes of voters who are especially likely to be burdened, and it found that HB 1569 imposed greater burdens than the photo ID law at issue in *Crawford*. Op.61-71, 79-82; *infra* Section II.C. Then, it appropriately reviewed the state's purported interests with a more rigorous eye than in *Crawford*, as necessitated by *Anderson-Burdick*'s sliding scale. Op.72-78, 82-83; *infra* Section II.C.

In their stay briefing, Defendants pretend that Justice Scalia's non-controlling *Crawford* concurrence (joined only by Justices Thomas and Alito) carried the day. Citing that concurrence ubiquitously, Defendants contend that courts *must* apply Scalia's more rigid "two-track approach" and may only consider the burdens imposed "on *voters generally*" while ignoring heavy impacts on particular groups. Mot. at 19-21 (quoting *Crawford*, 553 U.S. at 205-06 (Scalia, J., concurring)); *but see* Mot. at 16 (conceding "[t]he Supreme Court has consistently held" that a voting law must "not impose 'excessively burdensome requirements on any class of voters'" (quoting *Crawford*, 553 U.S. at 202-03)).

Not so. Where necessary, "lower courts should examine the plurality, concurring and dissenting opinions to extract the principles that a majority has

embraced." *United States v. Johnson*, 467 F.3d 56, 65 (1st Cir. 2006). *First*, six members of the *Crawford* Court—the three plurality Justices, *see Crawford*, 553 U.S. at 190 n.8 (plurality), and all three dissenters, *id.* at 210 (Souter, J., dissenting); *id.* at 237 (Breyer, J., dissenting)—rejected Justice Scalia's attempted reframing of the *Anderson-Burdick* balancing test as a two-track approach. *See Fish*, 957 F.3d at 1125 n.4 (same). *Second*, the same six justices in *Crawford* concluded that burdens on subsets of voters must be considered, contrary to Scalia's preference. *See* 553 U.S. at 198-200 (plurality); *id.* at 212-16 (Souter, J., dissenting) (relying on "disproportionate[]" burdens on "[p]oor, old, and disabled voters," and rural voters); *id.* at 237-39 (Breyer, J. dissenting) (relying on "disproportionate burden[s]" on "poor, elderly, or disabled" voters).

Consistent with the majority of the justices' opinions in *Crawford*, other courts applying the *Anderson-Burdick* framework have, like the district court here, consistently recognized that the plurality opinion represents the "controlling" decision in *Crawford* because "it is the narrowest majority position." *Fish*, 957 F.3d at 1123 (citation omitted).[5] Defendants ignore all those cases. For instance, in *Fish*,

---

[5] *See also, e.g.*, *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1319 n.31 (11th Cir. 2021); *Brakebill*, 932 F.3d at 688 n.2; *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 387 (9th Cir. 2016); *Eakin v. Adams Cnty. Bd. of Elections*, 149 F.4th 291, 309 (3d Cir. 2025).

the Tenth Circuit recognized that a majority rejected Scalia's approaches, and it instead applied the controlling "sliding scale" approach and confirmed that courts may "specifically consider the limited number of persons on whom the burdens that are relevant to the issue before us will be somewhat heavier." *Id.* at 1124-25 & n.4 1127 & n.5 (cleaned up). The First Circuit has adopted a similar approach. In *Common Cause R.I.*, this Court identified a "significant" burden—between Scalia's *severe* and *not severe* tracks—while emphasizing specialized impacts, for example, how a witness requirement during the pandemic would especially burden "senior voters" who "fac[e] a higher risk of COVID-19 complications." 970 F.3d at 14 & n.1.

In short, Defendants' novel position (at 20) that a burden cannot be significant simply because it is "widespread" and facially "nondiscriminatory" runs contrary these and other longstanding precedents. *See Anderson*, 460 U.S. at 793 (finding suspect any "burden that falls unequally" or "limits political participation" based on "economic status"); *Bullock v. Carter*, 405 U.S. 134, 144, 149 (1972) (invalidating filing fee requirement that "would fall more heavily on the less affluent segment of the community"). Indeed, the implication of Defendants' argument is that even a poll tax would be constitutional because every voter would technically have to pay. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966) (invalidating poll tax on basis of burden).

Defendants also invoke (at 15-16) a confusing array of generalized principles about facial challenges, which appear related to their preference for Justice Scalia's unsuccessful theories. *See also* Op.60 n.20 (dismissing these "conclusory" and "unsupported" arguments). They argue (at 16) that facial challenges are generally disfavored and that such claims must be subjected to a "rigorous standard," but this argument is no more successful in undermining the district court's analysis, as they wholly ignore that *Crawford* recognized the plaintiffs' facial challenge and nonetheless confirmed the aforementioned *Anderson-Burdick* framework *is* the appropriately rigorous test. 553 U.S. at 188-91, 200-03.

The district court's faithful application of controlling precedent does not support a stay.

**2. Defendants Have Forfeited Any Argument That a Different Legal Standard Applies.**

Defendants are especially unlikely to succeed on these arguments because they have been forfeited. "It is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals." *Slade*, 980 F.2d at 30 (collecting cases). "To preserve a point for appeal, some developed argumentation must be put forward in the nisi prius court--and a veiled reference to a legal theory is not enough to satisfy this requirement." *Mullane*, 113 F.4th at 132 (citation omitted).

Despite multiple opportunities to do so, Defendants never meaningfully argued to the district court that Justice Scalia's concurrence in *Crawford* represents the controlling statement of law for *Anderson-Burdick* claims or that *Crawford* (or any other case) should be overruled. Notably, the district court directed Defendants to identify, prior to trial, all of their legal defenses, and the district court further confirmed (and re-confirmed), after the close of the trial record, the arguments that each party wished to pursue. *See* Feb. 20, 2026 Tr. 95:4-108:18, 117:20-121:6; Min. Order (Jan. 20, 2026). At no point did Defendants indicate that the district court should evaluate Plaintiffs' claims under the standard articulated in Scalia's *Crawford* concurrence. Indeed, in their statement of legal defenses, Defendants exclusively cited *Crawford*'s plurality and Justice Souter's *dissent*, with no mention of the concurrence whatsoever. *See* Dkt.124 at 1-3. Defendants' post-trial filing contained a sole footnote purporting to "reserve the right" to argue (but not in fact arguing to the district court) "that *the Supreme Court* should adopt the approach articulated by the concurrence in *Crawford*, *should such an argument be relevant to any appeal*." Dkt.169 at 5 n.3 (emphasis added). Such a half-hearted, "veiled reference to a legal theory," with no analysis and the trial record already closed, merely confirms that this is an argument that Defendants never raised, and it is not sufficient to preserve the issue for appeal. *See Mullane*, 113 F.4th at 132.

Moreover, when Plaintiffs raised this forfeiture in response to Defendants arguing for a novel legal standard for the first time in their district court stay motion, Dkt.189 at 17-18, Defendants declined to file any reply refuting Plaintiffs' argument. The district court adopted Plaintiffs arguments wholesale in denying the stay. *See* July 22, 2026 Endorsed Order.

**C. The District Court Correctly Weighed the Evidence in Finding the Challenged Provisions Unconstitutional.**

Defendants are unlikely to prevail in a challenge to the district court's careful weighing of evidence, based on this trial record and the district court's extensive factual findings. Defendants repeatedly accuse the district court (at 3, 8, 15, 20-21, 26) of relying solely on "hypothetical," "imaginary," "idiosyncratic," or "individualized burdens," and of "undervalu[ing] the State's interest in election integrity." But they attack a straw-man trial of their own creation. Even a cursory review reveals the district court crafted a thorough, nearly 100-page opinion—based on two weeks of oral and stipulated testimony from 26 witnesses (including three plaintiffs' experts but zero defense experts) and a voluminous evidentiary record—replete with factual findings fatal to Defendants' appeal.

The court found that eliminating the QVA to prove citizenship "significantly burdened New Hampshire voters" at large and would have "a particularly detrimental impact on young residents and married women." Op.61. Contrary to Defendants' claim (at 17), the court's ruling did not rest on "a small subset of voters

who may hypothetically experience a unique burden under HB 1569." Rather, the court conducted a "general assessment of the burden," *see Crawford*, 553 U.S. at 207 (Scalia, J., concurring), and found that, typically, "more than 10% of all registrants"—and nearly 17% of first-time registrants—relied on QVAs to prove citizenship, Op.61. The court drew a "reasonable inference" that "a significant portion" of those voters used QVAs because they either "did not possess or could not easily retrieve DPOC." *Id.* at 62. The court supported its inference with undisputed expert testimony that as many as 238,330 eligible voters would have difficulty producing DPOC—in a state that totaled only 831,033 votes in the 2024 presidential election. *Id.* at 62-63.[6] The court further found these "burden[s] on all voters" are especially pronounced "looking at New Hampshire's voting scheme as a whole," which primarily relies on election day registration while prohibiting provisional balloting, Op.61, 64-65.

Notably, these burdens are far from "hypothetical" or "speculative." The court also relied on undisputed evidence that hundreds of high-propensity prospective voters were turned away in low-turnout, local elections in 2025 after HB 1569 took effect. Op.65-66. These burdens were further corroborated by more "powerful

---

[6] *See* N.H. Sec'y of State, 2024 General Elections Results, President of the United States, https://www.sos.nh.gov/sites/g/files/ehbemt561/files/inline-documents/sonh/2024-ge-president_3.xls (last visited August 17, 2026).

proof"—namely, direct testimony from election officials, poll observers, and Defendants' own witnesses—who witnessed voters turned away by the QVA's elimination. Op.16-20, 66.[7] Defendants might wish to characterize these figures as "small"—though they are orders of magnitude greater than the instances of unlawful voting that the State claims an interest in preventing—but their disagreement with the trial court's factfinding is not grounds for a stay, much less reversal.

As to the CVA, which Defendants' motion barely addressed on the merits, the district court also relied on testimony from Defendants' witnesses confirming that it was an important safeguard against erroneous disenfranchisement, particularly when voters have faced frivolous challenges lodged *en masse* in New Hampshire, and that the alternative scheme of requiring costly appeals to superior court is too burdensome and infeasible for virtually all voters—not just some—to navigate. Op.79-82. Defendants' stay motion makes no mention of (and accordingly has shown no likelihood of success of prevailing against) Plaintiffs' procedural due process claim and the district court's corresponding analysis under the *Mathews v. Eldridge* framework. Op.84-88.

---

[7] The Court's burden analysis further found these burdens were compounded by evidence of election worker error (including by Secretary's Office); that specific groups—including young voters and married women, are "disproportionately burdened"; and that the state's attempt to mitigate the burden "do far too little to change the court's analysis in any meaningful way." Op.66-72.

Next, Defendants contend (at 23) that the district court impermissibly "disregarded New Hampshire's important regulatory interests" on their side of the balancing test, but they identify no errors in the court's finding that HB 1569 does not advance the State's purported interests. The court recognized that each interest was "legitimate in the abstract," but defendants offered "no concrete evidence" that those interests justify these significant burdens. Op.72-73 (quoting *Fish*, 957 F.3d at 1132). The "incremental interest" in election integrity was nearly nonexistent. Expert testimony *and* defense witnesses confirmed that "[o]nly eight people identified as noncitizens *may* have cast a ballot during [the last] 26 years," only three of whom "*may* have registered using QVAs," and only *one* of whom was alleged—but not proven—to have committed fraud (rather than registering due to election-official error). Op.35, 37, 74-75 (emphasis added). The interests in voter confidence and the public fisc were similarly weak. Op.75-76 (detailing how "defendants do not even attempt to explain how eliminating the citizenship QVA furthers the state's interest in improving voter confidence" and why HB 1569 "may have precisely the opposite effect"); Op.76-78 (finding that HB 1569 "does nothing to conserve state resources expended" on irrelevant efforts raised by Defendants, and instead "has already resulted in substantial costs").

And as to the CVA, Defendants cannot contest the district court's findings. Secretary Scanlan conceded that "he could not think of a single state interest

advanced by [its] elimination," Chief Investigator Tracy testified the new system "doesn't make sense," and Deputy O'Donnell confirmed that the CVA had operated as a "safeguard" against meritless attacks on voters' eligibility. Op.81-83; Feb. 18, 2026 Tr. 20:5-19.

Unable to refute the court's factual analysis of their purported interests, Defendants instead resort to citing cases (at 19-20) for the general proposition that election integrity is a legitimate state interest. But this further indicates their failure to grasp the governing legal standards. The district court *did* recognize the legitimacy of each interest "in the abstract." Op.72. But where, as here, the burden on voters is more than minimal, courts must ask whether "the incremental interest in the specific regulation at issue" is justified, not whether "in the abstract, the broader regulatory interest—preventing voting fraud and enhancing the perceived integrity of elections—is substantial and important." *Common Cause R.I.*, 970 F.3d at 15.

In fact, when the court's factual findings are accurately characterized, the district court's order would survive even under the principles articulated in Justice Scalia's concurrence in Crawford, which held Indiana's voter ID law constitutional for two key reasons: the burden of obtaining "a free photo identification [wa]s simply not severe," and the requirement of a photo ID was "universally applicable." *Crawford*, 553 U.S. at 209 (Scalia, J., concurring). The scheme that New Hampshire has erected violates both principles. As discussed above, rather than make DPOC

available at no cost to all voters, New Hampshire's scheme is designed to selectively benefit a subset of voters who will have free access to DPOC or are otherwise exempt from providing a birth certificate or a passport, while others must pay for such costly documentation. Because the ability to comply with the DPOC requirement is neither "universal" nor "free," Defendants would be unlikely to prevail even under Justice Scalia's concurrence.

For these reasons, Defendants are unlikely to succeed in arguing that the district court abused its discretion in weighing the record evidence.

### D. The Scope of the District Court's Injunction Was Proper and Necessary to Afford Complete Relief to Plaintiffs.

Defendants have also failed to make a strong showing that the district court abused its discretion in terms of the "breadth" or "scope" of the relief it ordered. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 14 (1st Cir. 2000). The district court enjoined only the challenged provisions of HB 1569 that it found unconstitutional—those eliminating the ability to use QVAs to prove citizenship and CVA to respond to eligibility challenges—and left the rest of the law intact. Op.96-97. This is precisely the type of relief Defendants admit (at 26) is proper: awarding "equitable relief" that requires "state actors to refrain from violating federal law" and extends no "further than necessary to afford" Plaintiffs "complete relief." Nonetheless, Defendants make two meritless objections to the scope of relief.

*First*, Defendants contend (at 27-28) the district court improperly "resurrect[ed] and impose[ed]" a "*repealed* State law" and "mandate[d] that State officials implement it" by "compel[ing] the State to issue and rewrite defunct QVA and CVA State forms." Their claim (at 27) that "the court went much further than simply declaring HB 1569 unconstitutional and enjoining Defendant-Appellants from enforcing it" is belied by the text of the injunction itself. *See* Op.96-97. When enjoining the challenged provisions, the court did not fashion an unusual remedy or rewrite New Hampshire's law. It merely returned to the status quo ante.

The district court did precisely what the Supreme Court has long instructed when a legislature adds "an unconstitutional amendment to a prior law": the court treats "the original, pre-amendment statute as the 'valid expression of the legislative intent,'" and excises the unconstitutional provisions "'introduced by amendment,' so that 'the original law stands'" *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 630 (2020) (quoting *Frost v. Corporation. Comm'n of Okla.*, 278 U.S. 515, 526-27 (1929)). Similarly, the New Hampshire Supreme Court has held that courts must "presume that the legislature intended that the invalid part shall not produce entire invalidity if the valid part may be reasonably saved." *Associated Press v. State*, 153 N.H. 120, 141 (2005) (citation omitted). Defendants make no argument otherwise here.

Instead, they protest (at 29) that the district court could have imposed an alternative remedy: "perhaps" it could have ordered the Secretary "to accept registrants who bring notarized sworn affidavits as proof of citizenship, or proof that a challenged voter's ballot is valid." But nowhere in the statute does the New Hampshire legislature contemplate such a system, and "[u]nder our constitutional framework, federal courts do not sit as councils of revision, empowered to rewrite legislation." *United States v. Rutherford*, 442 U.S. 544, 555 (1979). Such "editorial freedom . . . belongs to the Legislature, not the Judiciary." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 510 (2010).

*Second*, Defendants argue (at 27) that the remedy is improper because none of the individual plaintiffs will ever need a QVA to vote or a CVA to overcome a challenge. This argument also fails for reasons already articulated. *See supra* § II.A.2. And because Defendants have not "develop[ed] an argument that, even if the plaintiffs have Article III standing, the District Court abused its discretion," their argument ends where it starts. *Rhode Island v. Trump*, 155 F.4th 35, 45 (1st Cir. 2025). More importantly, though, Defendants fail to address how the relief ordered by the district court could be inappropriate in light of the injuries to the *organizational plaintiffs*; they have thus waived the argument. *See, e.g.*, *Vázquez-Rivera v. Figueroa*, 759 F.3d 44, 47 (1st Cir. 2014).

Defendants still do not address how the Court could afford complete relief to the *organizational* Plaintiffs without a statewide injunction. Plaintiffs help register and educate voters and field poll observers throughout New Hampshire, *see, e.g.*, Op.41-46, so it is otherwise "impossible for [the Court] to craft relief that is complete *and* benefits only the named plaintiffs," *Trump v. CASA, Inc.*, 606 U.S. 831, 852 n.12 (2025); *see also Shaw v. Smith*, 166 F.4th 61, 80 n.11 (10th Cir. 2026) ("the Supreme Court left open for lower courts to determine the scope of 'complete relief' when granting injunctions" including through by providing "an 'indivisible remedy' which incidentally benefits some third parties."). Allowing voters to register or vote under different standards across the state would raise constitutional concerns, *cf. Bush v. Gore*, 531 U.S. 98, 104-05 (2000), as citizens have the "right to participate in elections on an equal basis with other citizens in the jurisdiction," *N.E. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 598 (6th Cir. 2012) (citation omitted).

Defendants have not made a strong showing that the court abused its discretion in enjoining the challenged provisions as unconstitutional.

## III. The Equities and Public Interest Strongly Counsel Against a Stay.

Defendants must show that a stay will not "substantially injure the other parties interested in the proceeding" and that it serves "the public interest." *Nken*, 556 U.S. at 426, 433-434 (citation omitted). They cannot. The balance of the equities favors Plaintiffs, who would suffer irreparable harm if this injunction were stayed,

and the public interest favors protecting the fundamental right to vote. *Obama for Am. v. Husted*, 697 F.3d 423, 436-37 (6th Cir. 2012).

The district court detailed the harms inflicted on Plaintiffs by HB 1569. *E.g.*, Op.50-51, 54-58. Since the injunction, Open Democracy has resumed helping students use the QVA to register to vote. Dkt.189 at 20 & n.13. A stay would once again deny Plaintiffs the ability to help register as many eligible voters as possible ahead of upcoming elections. That loss of opportunity "is irreparable because after the registration deadlines . . . pass, 'there can be no do over and no redress.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (citation omitted).

Defendants' conduct further counsels against a stay. The morning after the injunction issued, Secretary Scanlan restored voters' ability to use the QVA to prove citizenship and the CVA for voter challenges, and publicly confirmed that those affidavits would be available for the September and November elections. Dkts. 189-1, 189-2. That prompt implementation is consistent with Defendants' repeated representations throughout this litigation that if the court ordered relief before July 2026—as it ultimately did—they could implement the relief in time for the September primary and November general election without issue. *See* Feb. 20 Tr. 65:20-66:1; Scanlan Dep., Dkt.103-11 at 474:1-10 (Oct. 22, 2025); Op.95-96. Given these representations and voters' reliance on them, a stay of that relief would be inequitable. *See Rose v. Raffensperger*, 143 S. Ct. 58, 59 (2022).

The public interest supports voters' "strong interest in exercising the fundamental political right to vote." *California v. Trump*, 2026 WL 2144084, at *12 (1st Cir. July 25, 2026) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). HB 1569 has the effect of disenfranchising a significant number of voters who rely on affidavits, Op.71-72, and the risk of disenfranchisement is even greater now that the Secretary has assured voters, for months, that they need not obtain citizenship documentation before this year's elections. A stay at this juncture "would sow confusion and threaten disenfranchisement of many eligible voters" relying on official guidance. *California*, 2026 WL 2144084, at *12. Defendants argue (at 32) that "the public expresses its interests in the laws its representatives enact." But the law in question has been adjudged unconstitutional, so "the public interest would be adversely affected" by a stay. *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 854 (1st Cir. 1988) (citation omitted).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion.

Dated: August 17, 2026

Respectfully submitted,

COALITION FOR OPEN DEMOCRACY, THE LEAGUE OF WOMEN VOTERS OF NEW HAMPSHIRE; THE FORWARD FOUNDATION; MILES BORNE, A.M. by his next friend Russell Muirhead; L.M. by her next friend Russell Muirhead

By and through their attorneys,

/s/ Henry Klementowicz
Henry Klementowicz, No. 1179814
Gilles R. Bissonnette, No. 123868
Maria D. Savarese, No. 1223427
AMERICAN CIVIL LIBERTIES
UNION OF NEW HAMPSHIRE
FOUNDATION
18 Low Avenue
Concord, NH 03301
(603) 333-2201
henry@aclu-nh.org
gilles@aclu-nh.org
maria@aclu-nh.org

Jacob van Leer, No. 1218321
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW Washington, D.C.
20005
(202) 715-0815
jvanleer@aclu.org

Ming Cheung, No. 1218322
Clayton Pierce, No. 1218300
Ethan Herenstein, No. 1221386
Davin Rosborough, No. 1224907
Sophia Lin Lakin, No. 1214581
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street New York, NY 10004
(212) 549-2500
mcheung@aclu.org
cpierce@aclu.org
eherenstein@aclu.org
drosborough@alcu.org
slakin@aclu.org

Geoffrey M. Atkins, No. 1218320
John T. Montgomery, No. 41751
Stephanie A. Ainbinder, No. 1194805
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000
Geoffrey.Atkins@ropesgray.com
John.Montgomery@ropesgray.com
Stephanie.Ainbinder@ropesgray.com

Alex H. DiLalla, No. 1224906
ROPES & GRAY LLP
191 N Wacker Dr, 32nd Floor
Chicago, IL 60606
(312) 845-1200
Alex.DiLalla@ropesgray.com

*Counsel for* Open Democracy *Appellees*

## CERTIFICATE OF COMPLIANCE

I certify that this Motion complies with the 7,800 word limit, as approved by this Court in response to the Open Democracy Appellees' Assented-To Motion For Enlargement Of Word Limit For Opposition To Motion To Stay, in that it contains 7797 words including footnotes. This Motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it has been prepared using Microsoft Word in 14-point Times New Roman typeface.

*/s/ Henry Klementowicz*
Henry Klementowicz

Dated: August 17, 2026

## CERTIFICATE OF SERVICE

I hereby certify that this document is served on today's date to all registered users of the court's e-filing system who have appeared in this case by the court's electronic filing system.

*/s/ Henry Klementowicz*
Henry Klementowicz

Dated: August 17, 2026